## NATIONAL INSTALLMENT LENDERS PLAN, INC.

v.

## EMPLOYERS REINSURANCE CORPORATION.

### Civil No. JFM–95–1534.

United States District Court,
D. Maryland.

Nov. 27, 1996.

---

William D. Hooper, Jr., Bel Air, MD, for plaintiff.

Joseph F. Cunningham, Valerie L. Tetro, Washington, DC, Donald E. Sharpe, Piper & Marbury, Baltimore, MD, for defendant.

## MEMORANDUM

MOTZ, Chief Judge.

Plaintiff National Installment Lenders Plan (NILP) has brought this diversity action against its insurer, Employers Reinsurance Corporation (ERC). NILP seeks a declaratory judgment that ERC is obligated to defend NILP in a state indemnification action brought by Fidelity & Deposit Company of Maryland (F & D). Discovery has been completed and ERC has filed a motion for summary judgment.[1]

### I.

NILP, a wholly-owned subsidiary of Matterhorn Insurance Agency, Inc. (Matterhorn), is a Maryland corporation. Commencing in 1984, NILP served as a general managing agent for F & D, issuing "comprehensive lender's single interest insurance."

Several financial institutions sued F & D in California for allegedly misrepresenting the coverage provided by the single interest insurance. The lawsuits asserted that as managing agent, NILP should have been aware of the alleged misrepresentations. F & D notified NILP of the litigation in 1990, and made several requests for reimbursement of approximately $66,000 in costs which F & D had incurred in defending the suits. NILP refused to pay F & D's expenses, but cooperated in the litigation. On January 19, 1994, F & D demanded reimbursement, explicitly stating that it was entitled to indemnification and urging NILP to notify its errors and omissions insurer. The amount of the demand stated in this letter was over $600,000. During all of this time, NILP was insured under a Professional Liability Insurance Policy between ERC and NILP's corporate parent, Matterhorn, covering negligence on

NILP's part within the scope of its duties as an insurance agency.

The first notice that NILP gave to ERC of the claim was on May 27, 1994, when it forwarded a package of certain materials. NILP asserts that the May package included the January 19, 1994 letter, but ERC denies ever receiving the letter until it obtained it during discovery in this case. ERC claims that it was not adequately informed of F & D's claim until September, 1994, when NILP forwarded a letter from F & D's counsel threatening litigation. The present amount of F & D's claim is approximately $1,250,000, consisting of the costs that it incurred in defending the California litigation and in contributing to a settlement of that litigation.

### II.

As just indicated, the parties dispute whether F & D's demand letter of January 14, 1994 was included in the package of materials that NILP sent to ERC on May 27, 1994. NILP asserts that it was; ERC denies the same. The parties also disagree about whether NILP's May 27, 1994 package provided adequate notice of F & D's claim without the January 14, 1994 letter being included. NILP asserts that it did; ERC again denies the same. ERC's position on both questions is the meritorious one. In a moment I will analyze the matters of record to demonstrate why this is so. I will first, however, explain why these questions are dispositive.

NILP had a claims made policy with ERC. Under the terms of the policy in order for a claim to be covered NILP both had to receive notice of the claim and give ERC notice of the claim within the policy year. The 1994 policy year ran from September 1, 1993 to August 31, 1994. The 1995 policy year ran from September 1, 1994 to August 31, 1995. Therefore, if the May 27, 1994 package sent by NILP to ERC did not include the January 14, 1994 letter and did not otherwise provide adequate notice of F & D's claim, notice of the claim was not given by NILP to

---

1. On November 30, 1995, Judge Northrop, to whom this case was then assigned, issued a memorandum and order denying an earlier mo-

tion for summary judgment filed by ERC. Judge Northrop did not address the issues that I find to be dispositive.

ERC until the 1995 policy year had begun (when NILP submitted a letter from F & D's counsel threatening litigation).

■ This fact is critical because ERC eventually canceled the 1995 policy on the ground that NILP had obtained the policy by making a misrepresentation on the renewal application. ERC's cancellation of the policy was proper.[2] One of the questions on the renewal application asked if any errors or omissions claims had been filed against NILP within the past ten years. NILP responded: "see your claim file." Since, as I discuss *infra*, the claim file did not contain adequate notice of the F & D claim, NILP's reference to the claim file was nugatory and misleading.[3] Therefore, ERC's cancellation of the 1995 policy was proper with the result that NILP never gave ERC notice of the F & D claim under a viable policy.

### III.

#### A.

Was the January 19, 1994 demand letter from F & D to NILP included in the package of materials that NILP forwarded to ERC on May 27, 1994? As this litigation has progressed, the issues have become more refined, and the importance of that question

did not become apparent until ERC filed its memorandum in support of its renewed motion for summary judgment. In opposing the motion NILP submitted the affidavit of John L. Bartha, presently the president of Matterhorn (NILP's parent) and the author of the May 27, 1994 cover letter to ERC. In his affidavit Bartha states that a copy of F & D's demand letter of January 14, 1994 was among the materials that he enclosed with his May 27th letter.

■ The difficulty with the Bartha affidavit is not only that it comes so late but that it is contradicted by a prior discovery response made by NILP. In answering a request for production of documents, NILP described the attachments to Bartha's May 27, 1994 letter without making any reference to F & D's January 14, 1994 demand letter. The law is clear that a party cannot create a genuine issue of material fact by submitting an affidavit contradicting prior sworn testimony given by one of its agents. See, e.g., *Rohrbough v. Wyeth Lab., Inc.*, 916 F.2d 970, 974–76 (4th Cir.1990). There is no reason why the same rule should not apply when a party seeks to create a genuine issue of material fact by submitting an affidavit contradicting a response to a document request.[4]

---

**2.** It might be argued that NILP's September, 1994 notice to ERC was untimely even if the 1995 policy had been validly obtained and remained in force and effect. This is so because under the policy language a claim is covered only if the insured receives notice of a claim and gives notice of the claim to the insurer during the policy year. This language could be read strictly to mean that if an insured receives notice of a claim on the last day of the policy year, she must provide notice of that claim to the insurer that very day even if she had validly purchased another claims made policy with the same insurer which commenced the next day. I would be loathe, however, to reach such an unreasonable result. I also note that I do not read *T.H.E. Ins. Co. v. P.T.P., Inc.*, 331 Md. 406, 628 A.2d 223 (1993), cited to me by counsel for ERC during oral argument as requiring such a result. To the contrary, it seems to be implicit from the court's ruling that factual issues remained to be tried concerning plaintiff's renewal policy, 628 A.2d at 231 n. 9, that where there is a continuing series of claims made policies, the insured may give notice to the insurer of a claim received by the insured in one policy year during the next policy year (at least if she does so within a reasonable period of time after her own receipt of notice of the claim).

**3.** ERC argues that NILP's response was misleading in another respect. NILP had been answering the same question on prior renewal applications in the same way, referring to an unrelated claim made against NILP that had been settled at the time that the renewal application for the 1995 policy was submitted. ERC may be correct but the point is not critical to my decision.

**4.** I note that NILP's document request response also misdescribed one of the attachments, a letter dated January 15, 1991, and omitted reference to another letter, one dated January 7, 1991, that apparently was forwarded with Bartha's May 27, 1994 letter. Arguably, these errors indicate that the document request response was merely prepared sloppily. However, the January 19, 1994 letter was an extremely important one in that it made current and multiplied by almost tenfold the claim that had been made in the 1991 letters. If that letter had been included in the May 27, 1994 package, it would have been natural to refer to it. Moreover, as discussed in the text, ERC's contemporaneous memoranda strongly demonstrate that the January 19, 1994 letter was not forwarded to ERC on May 27, 1994.

Furthermore, two memoranda that were prepared by employees of ERC after receiving the January 19, 1994 letter in September, 1994 reflect that the letter had not been sent to them in May. These memoranda have an inherent credibility because they were written before ERC had any reason to distinguish between notice received in May and September.[5] The first of them, written on October 12, 1994, by Arthur Stirnaman, claims counsel for ERC, stated (in part) as follows:

> In May of this year Matterhorn submits a potential claim for attorney fees for the defense of a lawsuit in California by Fidelity & Deposit. [NILP] was a MGA for F & D for lenders single interest program for banks. The potential claim was a January 1991 letter from F & D requesting attorney fees. In September of this year Matterhorn submits a letter from F & D's attorney demanding payment of $1.25 million in attorney fees. F & D claims the action against F & D was based on [NILP's] acts.
>
> I would appreciate your thoughts as to whether coverage exists for this claim. My first impression is that in May 1994 when the claim was submitted to ERC's attention, [NILP] was not an additional insured on the Matterhorn policy. Also, I did not find in the correspondence or renewal applications the claim brought to the attention of underwriting.

On November 21, 1994, Ruth Anne Bearce, one of ERC's assistant vice presidents to whom Stirnaman's memorandum had been addressed, wrote:

> On 6/2/94, I received a letter from the principal of this agency John Bartha regarding request from F & D to pay expenses totalling $66.000+ for a claim dating back to '91. On 7/24/94, I then received the renewal app for this account for the policy period of 9/1/94. Needless to say at that time, there was no addl. info reflected by this insured or by our claims dept. (I don't believe Art was aware of full demands surrounding this

claim) and we processed renewal application w/full surcharge. I felt that this "late claim notice" would simply be disclaimed and no further action on our part would be needed. We renewed account 8/30/94 and renewals issued 9/2/94.

These memoranda speak for themselves. Not to belabor the obvious, I will simply state that they both show that the claim brought to ERC's attention by NILP in May, 1994 was only F & D's demand for approximately $66,000 (the subject of F & D's January 7, 1991 letter to NILP), not F & D's subsequent demand for over $600,000 (the subject of F & D's January 14, 1994 letter). ERC's surprise about the fact that in September, 1994 NILP was asserting a claim for over $1,250,000 when the only amount previously claimed was $66,000—a claim based on a 1991 letter—is self-evidently genuine and belies NILP's present contention that the January 19, 1994 letter had been included in the May 27, 1994 package.

### B.

■ The question therefore becomes whether the materials that were included in the May 27, 1994 package were themselves sufficient to put ERC on notice of F & D's claim. The answer to this question is clearly no. The May packet contained (1) Bartha's cover letter, (2) a copy of one of the California complaints filed against F & D, (3) the January 7, 1991 letter from F & D to NILP requesting $66,000 in legal fees, and (4) a January 15, 1991 response from NILP denying responsibility for payment of those fees. Taken together, these documents do not provide an adequate description of the F & D claim. The 1991 exchange of letters gives the impression that NILP successfully disclaimed any responsibility for reimbursing F & D's defense costs, and nothing submitted by NILP indicates that there had been any further expenditures for which F & D might seek contribution. The packet's most patent inadequacy, however, is the absence of any indication that F & D was seeking nearly ten

---

5. The authors of the two memoranda have also submitted affidavits stating unequivocally that the January 19, 1994 letter was not contained in the May package. However, if all that was involved were competing affidavits, a genuine issue of material fact would, of course, exist.

times as much money in 1994 as it had sought three years previously.

NILP contends that Bartha's letter to ERC itself demonstrated that a current claim was being made by F & D. It reads in pertinent part as follows:

> Attached, please find a copy of an action against F & D by receivers for a bank which F & D insured and which action (we understand) has been thrown out and closed out in court but which has been appealed.
>
> F & D has expended defense dollars in handling this suit and has looked to National Installment to participate in the cost in 1991, which request was denied by National Installment.
>
> Even though the case has been thrown out the appeal to Supreme Court prompts F & D to once more seek defense cost participation by National Installment.
>
> We are sending this to you for your files in the event F & D pursues the matter further.

This letter gives the impression that F & D was simply inquiring again, as it had done in 1991, about the possibility of reimbursement from NILP, not that it was demanding indemnification and encouraging NILP to notify its insurer. Yet this is precisely what F & D had done in its January 19, 1994 letter, asserting a claim for over $600,000 and closing by saying: "You are strongly encouraged, therefore, to place your Errors and Omissions Insurer on notice of these matters if you have not previously done so."

NILP finally argues that the California complaint should have put ERC on notice as to the nature and magnitude of the California litigation. As Judge Northrop stated in his

earlier opinion in this case, while the complaint may have described the litigation underlying F & D's reimbursement requests, it did not indicate that F & D "had changed its position with respect to litigation" and was demanding reimbursement.

In sum, since (1) NILP cannot meet its burden of proving that the January 19, 1994 letter was included in the May 27, 1994 package, (2) the May package did not otherwise provide adequate notice of F & D's claim, (3) notice of the claim was not given by NILP to ERC until September, 1994, after the 1995 policy year had begun and (4) ERC properly canceled the 1995 policy because NILP had obtained it by making a misrepresentation on the renewal application, ERC is entitled to the summary judgment that it seeks.[6]

6. In light of the decision that I have reached, I need not consider ERC's alternative argument that it suffered prejudice by virtue of the fact that F & D settled the underlying California litigation between the time that NILP received F & D's January 19, 1994 demand letter and May 27, 1994, the earliest date on which NILP can argue it gave adequate notice of the claim to ERC. I note, however, that at least to the extent that F & D's claim is based upon the amount that it paid in settlement, there is much practical appeal to ERC's argument. Although NILP contends that ERC suffered no prejudice because it can contest NILP's liability to F & D in the action that F & D has instituted against NILP in the Circuit Court for Baltimore City, the dynamics that led to the settlement of the California litigation cannot be recreated in the Baltimore City case. Most critically, as counsel for ERC pointed out during oral argument, it is extremely unlikely that the judge presiding in the pending F & D case will permit ERC to litigate ancillary questions concerning the relative culpabilities of the parties (and, indeed, non-parties such as NILP itself) in the settled California litigation. The omelette has been made, and the eggs cannot be put back in their shells.